DMP:JGH

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                     17 CR 432 (BMC)

DARRYL ODOM,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A SENTENCING REDUCTION

                                                     SETH D. DUCHARME
                                                     Acting United States Attorney
                                                     Eastern District of New York
                                                     271 Cadman Plaza East
                                                     Brooklyn, New York 11201

Josh Hafetz
Assistant U.S. Attorney
    (Of Counsel)

**PRELIMINARY STATEMENT**

The government respectfully submits this memorandum of law in opposition to defendant Darry Odom's motion for a modification of an imposed term of imprisonment, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "First Step Act" or the "FSA"), filed pro se on December 4, 2020 (the "Motion"). Less than two years after this Court sentenced him to 171 months' imprisonment for what the Court called "horrendous" offense conduct, Odom, a fifty-six year-old man whose current anticipated release date from Bureau of Prisons ("BOP") custody is January 7, 2030, seeks a sentence reduction to time served. Odom seeks release based on his medical condition and increased risk of severe illness from the virus that causes COVID-19 ("COVID-19" or "the coronavirus") and based on his purported "extraordinary" rehabilitation since his March 2019 sentencing. This Court should deny the defendant's motion because he has not met the heavy burden of establishing that his circumstances warrant any sentence reduction, let alone the 75% reduction he seeks. Specifically, the Section 3553(a) factors that led this Court to impose a 171-month sentence on Odom in March 2019 – and which this Court must consider when deciding the Motion – strongly support his continued incarceration.

**FACTUAL BACKGROUND**

The Court has presided over Odom's case since its inception. The following is thus intended to provide only an overview of the case's procedural history, Odom's crimes of conviction, and his health and disciplinary history in BOP custody.

2

I. Background

    A. Procedural History

Odom was arrested on November 15, 2017 pursuant to a superseding indictment charging him and others with multiple counts of Hobbs Act robbery and conspiracy to commit the same as well as one count of brandishing a firearm during the commission of a crime of violence. See ECF Nos. 4, 36. Odom has been in custody since his November 2017 arrest.

On September 21, 2018, Odom pleaded guilty to two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and one count of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). See ECF Nos. 69, 80.

On March 5, 2019, this Court sentenced Odom to 171 months' incarceration, 84 months of which represented the statutory mandatory minimum period of incarceration resulting from the defendant's Section 924(c) conviction. See ECF No. 116.

    B. Odom's Offense Conduct

Odom committed two armed robberies of jewelry stores in Brooklyn, the first on February 10, 2017 and the second on May 25, 2017, during which Odom's co-defendant carried a firearm brandished during the robbery. Odom committed both robberies with others, all of whom also pleaded guilty. Each robbery is discussed in turn.[1]

        i. The February 10, 2017 Robbery

On February 10, 2017, Odom and another co-conspirator ("Co-Conspirator 1") drove with their co-defendant Leonard Hinton in Hinton's car to the area around "Elleven

---

[1] The facts set forth herein are contained in the Presentence Investigation Report ("PSR") prepared by the United States Probation Department ("Probation") as well as in the government's February 4, 2019 sentencing submission (Docket No. 104). The facts are undisputed.

3

Jewelry," a jewelry store located on Smith Street in Cobble Hill, Brooklyn. The men were there to rob the jewelry store, which both Odom and Co-Conspirator 1 had been planning to rob before February 10, 2017. Both Odom and Co-Conspirator 1 wore disguises; Co-Conspirator 1 wore women's clothes and a wig while Odom wore a hood, mask and gloves. One of the men also carried a knife. Odom and Co-Conspirator 1 entered the store and left Hinton in the car as the getaway driver.

Once inside, Odom and Co-Conspirator 1 robbed Elleven Jewelry. Co-Conspirator 1 put a knife to a female store employee (identified in the PSR as "Victim 2"), put a bag over her head and forced her to the ground, while Odom stuffed jewelry into a bag. The store owner (identified in the PSR as "Victim 1") descended from the store's second floor and attempted to stop the robbery by throwing various items at the robbers. Victim 1 sustained a minor cut to his hand as he threw one of the items.

After Victim 1 interrupted the robbery, Odom and Co-Conspirator 1 fled the store with approximately $2,000 to $3,000 of stolen jewelry. Victim 1 chased the robbers outside and a few blocks away to Hinton's vehicle and obtained the license plate before Hinton sped off with Odom and Co-Conspirator 1. In addition to the cut to his hand, Victim 1 suffered pain in his ankle after chasing the men, all of which he detailed in a victim impact statement provided to the Court prior to Odom's sentencing.

      ii.    <u>The May 25, 2017 Robbery</u>

On May 25, 2017, Odom and four co-defendants committed the violent armed robbery of Court Jeweler, a jewelry store on Court Street in Brooklyn Heights. That afternoon, Odom and his co-defendants Lashawn Williams, Kenneth Davis, and Co-Conspirator 1 traveled in the SUV of Kenneth Davis's nephew Shaka Davis to the area around Court Jeweler

4

in Brooklyn. Inside the car, Odom and several of the others discussed the robbery they were about to commit. Odom carried pepper-spray and Williams had a gun, which he displayed during the conversation in the car.

Shortly thereafter, Odom, Williams, Kenneth Davis and Co-Conspirator 1 left the SUV and walked to Court Jeweler. Shaka Davis, the getaway driver for the robbery, remained in the SUV. Several of the men, including Odom, had surveilled Court Jeweler before, including the day before the robbery.

To shield their identities and distract passersby from the robbery, Odom, Williams, Kenneth Davis and Co-Conspirator 1 all donned disguises before arriving at Court Jeweler. Kenneth Davis wore a white Tyvek HazMat suit, while the other men wore neon construction vests, hardhats, gloves and dusk masks in attempt to look like construction workers doing work inside the store.

Odom, Williams and Co-Conspirator 1 entered the store, Odom with the pepper spray and Williams armed with the gun. Kenneth Davis, who remained outside the door during the robbery, held a sign indicating that he and the others were doing asbestos removal at the store. Phone records show that Kenneth Davis and Shaka Davis used their cell phones to keep an open line of communication during the robbery.

With Kenneth Davis posted outside as their lookout, Odom, Williams and Co-Conspirator 1 entered the store and committed a brutal robbery. They punched, kicked and pistol-whipped the store owner (identified in the PSR as "Victim 3") in the face. Victim 3, in his late sixties at the time, was also pepper-sprayed and restrained with zip-ties while the men ransacked his store. While Victim 3 was on the floor, one of the men told him, "I'm going to shoot you, motherfucker."

5

As Victim 3 lay on the floor, tied-up and bleeding from blows to his head, Odom and the others stole hundreds of pieces of jewelry and cash from the store, including Victim 3's wallet. From the store's safe, the men stole jewelry, watches, gold scrap and approximately $250,000 in cash. The men also stole a gun from the safe, which Victim 3 kept after he was shot during a previous robbery of his store years earlier. Several of the items of jewelry stolen during the robbery were worth tens of thousands of dollars each.

When they finished robbing the store, Odom, Williams and Co-Conspirator 1 fled the area on foot with Kenneth Davis, carrying duffel bags stuffed with stolen property. Victim 3, despite serious injuries, chased the men on foot and, in doing so, thwarted the robbers' plan to return to Shaka Davis's getaway car. Instead, Odom and the others fled into the nearby subway station at Borough Hall, ditching parts of their disguises and dropping stolen property as they ran, including gloves, hardhats and an envelope containing $10,000 in stolen cash.

Later that day, Odom, Williams, Kenneth Davis and Co-Conspirator 1 met and divided up the cash and much of the stolen jewelry, although some jewelry was left for further division later. Each man received approximately $50,000 in cash as well as items of stolen jewelry.

As set forth in both the PSR and in his own written and oral statements to the Court, Victim 3 suffered grave physical injuries during the robbery, for which he was hospitalized and underwent surgery. He sustained permanent damage to his parotic glands which affect his swallowing, as well as permanent hearing loss and multiple wrist fractures which have impaired his ability to repair jewelry. A copy of Victim 3's victim impact statement previously submitted to the Court is attached here as Exhibit 1.

6

### D. Odom's Incarceration at FCI Ray Brook

The defendant is currently serving his sentence at the Federal Correctional Institute in Ray Brook, New York ("FCI Ray Brook"). The defendant's current release date from BOP custody is January 7, 2030, meaning that the defendant has served approximately 25% of the sentence this Court imposed in March 2019.

The BOP has informed the government that Odom has been cited for two disciplinary violations while at FCI Ray Brook. Both incidents occurred in 2018; one involved Odom "lying or falsifying statements" and the second involved Odom's refusal to follow an order.[2] The BOP has also informed the government that Odom has completed no education programs while at FCI Ray Brook.

Regarding the defendant's health, BOP medical records indicate that Odom has received treatment at FCI Ray Brook for asthma and COPD, and that his health conditions are stable and under control.[3] BOP has informed the government that Odom is classified as a "Care Level 1" inmate.[4] Inmates with Care Level 1 needs are generally healthy, under 70 years of age, and may have limited medical needs requiring clinician evaluation and monitoring, such as mild asthma, diet-controlled diabetes, and patients with human immunodeficiency

---

[2] A copy of the disciplinary records are included as Exhibit 2 to this filing.

[3] A copy of the medical records provided to the government are included as Exhibit 3 to this filing and have been provided to the Court via email and to the defendant via U.S. mail. Because the records contain the defendant's personal medical information, Exhibit 3 will be filed under seal on the Electronic Court Filing system.

[4] An inmate's "Medical Care Level" is based on his medical history and health condition. See https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP%20Medical%20Care%20Levels%205.17.17.pdf (last visited December 29, 2020 at 4:20 p.m.).

virus (HIV) who are stable and do not require medications. The BOP reserves Care Levels 2, 3 and 4 for inmates with more serious medical issues.

Prior to sentencing, Odom reported the following medical conditions to Probation: asthma, COPD, acid reflux and a hernia in his chest. Odom also reported that he has arthritis in his shoulder from a gunshot wound sustained when a store owner shot him during a prior attempted robbery. PSR ¶ 94.

E. Conditions at FCI Ray Brook

As of January 8, 2021, FCI Ray Brook reported that it currently has 9 active cases of COVID-19 among inmates and 8 active cases among staff members.[5] FCI Ray Brook currently is not permitting visitation in an effort to mitigate further spread of the virus, in addition to the litany of safety measures the BOP has imposed since the outbreak of the coronavirus in early 2020.

F. Odom's Motion for Sentence Reduction Under the FSA

Exhibit D of the Motion ("Defense Exhibit D" or "Def. Exh. D") indicates that in or about October 2020[6], Odom wrote to the Warden of FCI Ray Brook requesting that the Warden's office "file a motion for a reduction in sentence on my behalf in light of the First Step Act." Def. Exh. D. Odom's communication asserted that "extraordinary and compelling reasons," including risks posed by COVID-19, supported his requested sentence reduction.

---

[5] See https://www.bop.gov/coronavirus/index.jsp (last viewed January 8, 2021, at 4:45 p.m.). On January 6, 2020, the BOP website reported that FCI Ray Brook had 40 inmates and 2 staff members with positive tests for COVID-19.

[6] Odom's filing does not contain the precise date on which his request to the Warden was filed, nor the date upon which BOP staff replied to the request. However, the lower-right hand corner of Exhibit D indicated the document containing both Odom's request and the BOP response was printed on October 26, 2020. See Exhibit D.

Odom wrote that, if released, he would live with his wife and daughter at their home address, which he provided. Id. Defense Exhibit D further indicates that at some point after Odom sent his request to the Warden, his case manager at the facility responded by denying Odom's request, stating "Per guidance I have received, you do not meet edibility based on the following: you were convicted of a violent crime, your Pattern Risk score is Medium not Minimum and you have not completed more than 50% of your sentence. At this time your request is denied." Id.

On December 3, 2020, Odom filed the instant motion with this Court seeking "a reduction of sentence to time served" pursuant to the FSA. Motion at 2. As noted above, Odom asserts that the "extraordinary and compelling" reasons justifying the sentence reduction are: (1) his rehabilitation and (2) "the fact that he has looming medical issues, in conjunction with his age that place him in a high-risk category of dying, as well as the facts associated with the BOP's failure to protect prisoners and the living conditions related to the virus within the BOP." Motion at 24. In support of his request, Odom cites his current diagnoses of and treatment for COPD and asthma. Motion at 2-3, 24.

After reviewing the Motion, the government sought and obtained additional records from the BOP, including records regarding the denial of Odom's October 2020 request contained in Defense Exhibit D. The BOP has informed the government that Odom's October 2020 request was initially mistakenly misinterpreted as a request for home confinement and denied. The BOP subsequently re-reviewed Odom's October 2020 request as a request for compassionate release and, in January 2021, denied it. There is no record of Odom appealing the denial of his request for a sentence reduction although, as indicated above, Odom did not receive an official denial of his compassionate release request until January 2021.

## ARGUMENT

A. The Applicable Law

Unless an exception applies, a "court may not modify a term of imprisonment once it has been imposed." United States v. Pinto-Thomaz, No. 18-CR-579, 2020 WL 1845875, at *2 (S.D.N.Y. Apr. 13, 2020) (quoting 18 U.S.C. § 3582(c)). The FSA, which modified 18 U.S.C. § 3582(c), allows criminal defendants to move for "[m]odification of an imposed term of imprisonment" before a federal sentencing court. United States, v. Ngomani Dekattu, No. 18-CR-474 (ARR), 2020 WL 7711842, at *1 (E.D.N.Y. Dec. 29, 2020) (quoting 18 U.S.C. § 3582(c)). To qualify for relief under the FSA, defendants must show: (1) that they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf," or that thirty days have lapsed "from the receipt of such a request by the warden of [their] facility, whichever is earlier";[7] (2) that "extraordinary and compelling reasons warrant" a reduction in the term of imprisonment; (3) that these reasons outweigh "the factors set forth in section 3553(a) to the extent that they are applicable"; and (4) that a sentence reduction "is consistent with applicable policy statements issued by the Sentencing Commission." Id. (internal citations omitted); see also United States v. Cato, No. 16-CR-326 (ARR), 2020 WL 5709177, at *3 (E.D.N.Y. Sept. 24, 2020) (noting that defendant bears the burden of proof).

District courts may consider "the full slate of extraordinary and compelling

---

[7] Exhaustion is not an obstacle in this case. As noted above, the defendant submitted a request for a sentence reduction to the Warden of FCI Ray Brook in October 2020, and that request was denied. Accordingly, the government assumes for purposes of Odom's motion, that he has exhausted his administrative remedies.

reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Derounian, No. 16-CR-412 (JMA), 2020 WL 7625372, at *1–2 (E.D.N.Y. Dec. 22, 2020) (quoting United States v. Brooker, No. 19-CR-3218, 2020 WL 5739712, at *7 (2d. Cir. Sept. 25, 2020) (hereinafter "Zullo") (finding that "[b]ecause Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants [as compared to those brought by the BOP], Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling.")).[8]

Critically, "[e]ven if extraordinary and compelling reasons exist, they must outweigh the 18 U.S.C. § 3553(a) factors to warrant sentence reduction." Dekattu, 2020 WL 7711842 at *2 (citing 18 U.S.C. § 3582(c)(1)(A)); see also United States v. Lombardo, No. 17-CR-318 (JMA), 2020 WL 6118821, at *2–3 (E.D.N.Y. Oct. 16, 2020) ("Even if extraordinary and compelling reasons exist, a 'court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.'") (quoting United States v. Davies, No. 17-CR-57, 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020)); United States v. Flaharty, No. 98-CR-420 (BMC), 2020 WL 6565139, at *1–2 (E.D.N.Y. Nov. 9, 2020) (finding that

---

[8] The government respectfully submits that Zullo was wrongly decided. As set forth in the government's brief to the Second Circuit in Zullo and in its petition for rehearing en banc, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The FSA altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.

11

even if the Court found extraordinary and compelling circumstances, the "defendant would have to demonstrate that the factors under § 3553(a) weigh in favor of release").

        A.      <u>"Extraordinary and Compelling" Circumstances</u>

Odom claims two "extraordinary and compelling" circumstances in support of his sentence reduction: (1) his rehabilitation and (2) chronic health conditions which, coupled with the COVID-19 pandemic, endanger his life. Motion at 2-3, 23-24. His first claim has no merit. The second does.

            i.     <u>Odom's Claimed Rehabilitation Does Not Constitute an "Extraordinary and Compelling Circumstance"</u>

Odom's rehabilitation claim is meritless and should be rejected. Other than his self-serving assertion that he has undergone "extraordinary rehabilitation while incarcerated" and "dedicated his life to changing his character," (Motion at 3) Odom has provided no support that he has undergone rehabilitation justifying his release after an extensive criminal history which this Court recognized as "a life of crime that stands out." (Sent. Tr. at 20). Odom's unsupported claims that he has a "good behavioral record" and "has become a model of rehabilitation" (Motion at 3) also are belied by the two disciplinary violations he has committed in his relatively short time at FCI Ray Brook and the fact that he has availed himself of no educational classes while there. Finally, "even if [Odom] is on the path toward a change in his prior behavior," that alone "does not justify reducing his sentence." <u>United States v. Watson</u>, No. 16-CR-6118 (EAW), 2020 WL 6049710, at *3 (W.D.N.Y. Oct. 13, 2020).

            ii.    <u>Odom's chronic COPD and the COVID-19 Pandemic Together Constitute an Extraordinary and Compelling Circumstance</u>

The risk of COVID-19 by itself is not an extraordinary and compelling reason allowing compassionate release. As the Court of Appeals for the Third Circuit correctly stated,

12

"the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020); see also United States v. Gioeli, No. 08-CR-240 (BMC), 2020 WL 2572191, at *4–5 (E.D.N.Y. May 21, 2020) ("I cannot find that the danger defendant faces from the mere threat of exposure to COVID-19 constitutes an extraordinary and compelling reason for granting compassionate release.") (citing United States v. Korn, No. 15-CR-815, 2020 WL 1808213, at *7 (W.D.N.Y. April 9, 2020) (finding that the "mere possibility of contracting a communicable disease, in the absence of any [BOP] failures," is insufficient to satisfy extraordinary and compelling requirement)).

However, based on all the specific facts of this case, including the defendant's medical condition and the fact there are currently 9 active cases of COVID-19 among the inmate population and 8 active cases among staff members in FCI Ray Brook, the facility where the defendant is housed, and the fact that as recently as January 6, 2020, the facility reported 40 COVID-19 positive inmates, the government does not dispute that, in the context of the COVID-19 pandemic, the defendant has established an "extraordinary and compelling" reason permitting release. This decision is informed by the fact that the defendant suffers from COPD, which the CDC has identified as a condition that increases the risk of severe illness, even though the condition on its own would not support compassionate release absent the pandemic. E.g., United States v. Rosario, No. 09-CR-415 (VEC), 2020 WL 6946510, at *1 (S.D.N.Y. Nov. 25, 2020) (government conceded that the court found that defendant's COPD and other medical conditions, "considered in the context of the COVID-19, satisfy the extraordinary and compelling analysis" under Section 3582(c)(1)(A)"); see also e.g.,

13

United States v. Sterling, No. 16-CR-488, 2020 WL5549965, at *1 (S.D.N.Y. Sept. 16, 2020) (finding defendant with COPD, asthma, and other medical conditions demonstrated extraordinary and compelling reasons); United States v. Hernandez, No. 10-CR-1288-LTS, 2020 WL 3893513, at *2 (S.D.N.Y. July 10, 2020) (deeming medical conditions including COPD and obesity to constitute extraordinary and compelling circumstances); United States v. Pappas, No. 17-CR-67 (LDH), 2020 WL 5658775, at *1 (E.D.N.Y. Sept. 23, 2020) (government acknowledged, and Court found, that defendant's "severe obesity, in light of COVID-19 pandemic, is an extraordinary and compelling reason" allowing compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i)); but see United States v. Fuller, No. 16-CR-254 (BMC), 2020 WL 6565140, at *1–2 (E.D.N.Y. Nov. 9, 2020) ("[L]ike many other judges in this circuit, I do not believe that the potential of exposure to COVID-19, even for a member of a high-risk population, constitutes extraordinary and compelling reasons for compassionate release.") (citing United States v. Ellis, No. 96-CR-100, 2020 WL 5802312, at *2 (E.D.N.Y. Sept. 29, 2020) (collecting cases)).

      B.     <u>Odom's Motion Must Be Denied Because the Section 3553(a) Factors Do Not Warrant Release</u>

Assuming Odom has exhausted his administrative remedies and established that his COPD coupled with the COVID-19 pandemic constitute an "extraordinary and compelling" circumstance under the FSA, the Court must still deny the Motion because the Section 3553(a) factors weigh strongly against any reduction in sentence here, let alone the reduction to time served that Odom seeks.

This Court imposed the 171-month sentence on Odom with a full understanding of all the Section 3553(a) factors, which the Court found "line[d] up against [the defendant]

14

almost unanimously." Sentencing Tr. at 19. Indeed, at sentencing the Court engaged in detailed analysis of the statutory factors and concluded the following:

> The first factor in the statute that I have to consider is the nature and circumstances of the offense. This is not some sterile robbery of a bank teller who is shown a gun and given a note and you walk away with cash. This was horrendous, frankly. And I appreciate the victim coming forward and making the statement, but I did not need to hear that to know that it was as bad as it could get without anyone being killed. That is the way I feel about it. So it is the most activated of Hobbs Act robberies.
>
> Mr. Odom, when I look at your history and characteristics, which is the second factor that I am supposed to look at under the statute, you know, I appreciate what Mr. Montgomery is saying, and I think he is correct. I think you have got a great family. They really love you and I also think that you are not of the age that most criminals are when they commit crimes like this, but the fact is, you did it. I have to take those things into account in determining the appropriate sentence.
>
> But I am also looking at a history here of 15 convictions for offenses, including burglary, of which there are two; two convictions for criminal possession of a weapon; six convictions for petit larceny or attempt; trespassing; unlawful use of vehicle; possession of controlled substance; the prior first degree robbery. It is just a life of crime that stands out. I cannot get around that. And then it is capped, as you recognize, it is capped by what is probably the most brutal of all the things that you have done, even though you are at an advanced age.
>
> The next factor I have got to consider is deterrence, both general, the public has to see what happens when somebody commits crimes like this, and specific, which is I have got to protect the public to the extent necessary, from you, Mr. Odom. I generally accept the Government's argument that despite your age, either you do not have control or you are not using it, and there is a real risk to the public that you are going to commit these crimes again. As far as general deterrence, I think the public has got to know that it really does not matter how old you are when you participate in brutality like this, it is going to come to rest with you. As is often the case, I really regret the impact of the sentence I am going to impose on the family, because they are innocent. But Mr.

15

>      Odom, you did that to them, as you acknowledge, by apologizing
>      to them. You made those choices.

Sentencing Tr. at 19-20.

Reducing by nine years – 75% of his remaining sentence – would not in any event be warranted, but is particularly inappropriate given the severity of Odom's crimes, his lengthy criminal history and his demonstrated recidivism and danger to the public. Indeed, set against this Court's findings, including his "really severe criminal history" (Sentencing Tr. at 21), Odom's claims that "he is no longer a threat to public safety" and the "biggest indication of that is his rehabilitation" (Motion at 23) ring hollow. He has provided no evidence of his rehabilitation and his two disciplinary violations in a short period of time suggest the opposite.

Further, Odom's claim of a near-immediate transformation into a different person since March 2019 is belied not only by his litany of prior convictions and repeated recidivism after prior sentencings and periods of incarceration, but by the brutality of his conduct in May 2017, which this Court correctly identified as "probably the most brutal of all the things you have done." (Sentencing. Tr. at 20). Victim 3's account of the violence Odom and his co-defendants unleashed inside Court Jewelers on May 17, 2017 cannot be ignored. Odom knew before he entered Victim 3's store that his co-defendant was carrying a gun; that gun was then used to pistol-whip Victim 3. Odom himself carried and used pepper spray. Victim 3, who is over seventy years old, told this Court that after Odom and his co-defendants knocked him to the ground, "Mr. Odom specifically kicked me in the face several times while I was [z]ip-tied and had his foot and his body weight on my throat the whole time while emptying the vault. At the end of the robbery, Mr. Odom sprayed mace directly into my eyes before running out." Sentencing Tr. at 13. Victim 3 detailed the extensive damage Odom and

16

his co-defendants caused to Victim 3's body, mind and life, including permanent physical injuries that affect his ability to work and the loss of hundreds of thousands of dollars of property which has affected Victim 3's ability to retire. See PSR ¶¶ 14, & 22, Exhibit 1 and Sentencing Tr. at 12-16.

The savage beating Odom and his co-defendants inflicted on Victim 3 speaks not only to the punishment Odom deserves for the offense but to the need to protect the public from further violence from him and to deter others from engaging it, all of which are Section 3553(a) factors underpinning this Court's sentence in March 2019. This need has not diminished since then.

In sum, the Section 3553(a) factors "do not weigh in defendant's favor" and "[n]othing has changed from the date of sentencing." Fuller, 2020 WL 6565140, at *1–2. To the contrary, Odom's 2017 violent armed robberies, one of which resulted in horrific violence, make him a "continuing threat to the public" and one for which "[s]pecific deterrence is still necessary" id., and reducing his sentence to time served "would disserve the sentencing factors contained" in Section 3553(a). United States v. Allums, No. S6 15-CR-153 (VSB), 2020 WL 5796265, at *7 (S.D.N.Y. Sept. 29, 2020). See generally Rosario, 2020 WL 6946510 at *2 (denying compassionate release request based on Section 3553(a) factors); United States v. Figueroa, No. 04-CR-515 (KAM), 2020 WL 6873433, at *3–5 (E.D.N.Y. Nov. 23, 2020) (denying motion for compassionate release where, even assuming extraordinary and compelling requirement was satisfied, because Section 3553 factors did "not warrant a reduction"); United States v. Flaharty, No. 98-CR-420 (BMC), 2020 WL 6565139, at *1–2 (E.D.N.Y. Nov. 9, 2020) (same); United States v. Gioeli, No. 08-CR-240 (BMC), 2020 WL 2572191, at *4–5 (E.D.N.Y. May 21, 2020) (denying compassionate release motion and

finding that reducing the "defendant's sentence would be diminishing his transgressions and undermining the goals of the original sentence, among them, the need to dispense adequate punishment for defendant's multiple acts throughout his criminal career and to deter others from emulating his behavior) (citation omitted).

## CONCLUSION

For the foregoing reasons, Odom's motion should be denied.

Dated: Brooklyn, New York
       January 8, 2021

>                            Respectfully submitted,
>
>                            SETH D. DUCHARME
>                            Acting United States Attorney
>
>                       By:    /s/
>                            Josh Hafetz
>                            Assistant U.S. Attorney
>                            (718) 254-6290

cc: Darryl Odom (via certified mail)